NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JUL 24 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

THE SOCIETY OF APOSTOLIC
CHURCH MINISTRIES BISHOP,
ELIZABETH GARDNER
CORPORATION SOLE AND HER
SUCCESSORS,

      Plaintiff - Appellant,

  v.

UNITED STATES OF AMERICA,

      Defendant - Appellee.

No. 24-1765

D.C. No.
3:21-cv-08277-DJH

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted May 12, 2025
Phoenix, Arizona

Before: RAWLINSON, BUMATAY, and SANCHEZ, Circuit Judges.
Dissent by Judge BUMATAY.

    Plaintiff Society of Apostolic Church Ministries Bishop ("the Society")

brought this suit against Defendant United States challenging the Internal Revenue

Service's ("IRS") tax lien on the Society's Apache Knolls property and levy on the

---

    [*]    This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

Society's bank account to recover $826,381.05 in unpaid taxes owed by Elizabeth and Frederic Gardner for tax years 2002 through 2004. This action reflects another entry in a decades-long effort by the Gardners to avoid paying income taxes—an effort that has already reached this court four times.[1]

The IRS' tax lien and levy proceeded under the theory that the Society is the Gardners' "nominee." A "nominee" is "one who holds bare legal title to property for the benefit of another." *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013) (citation omitted). We review the district court's grant of summary judgment for the Government de novo, considering the evidence in the light most favorable to the Society and drawing all reasonable inferences in its favor as the nonmoving party. *See Hittle v. City of Stockton*, 101 F.4th 1000, 1011 (9th Cir. 2024).[2] We affirm.

Under 28 U.S.C. §§ 6321 and 6331, the IRS has broad powers to impose tax liens and levies upon properties belonging to persons who have not paid their

---

[1] *See Gardner v. Comm'r of Internal Revenue*, 845 F.3d 971, 973–74 (9th Cir. 2017) (describing history of the Gardners' tax evasion efforts); *see also Gardner v. IRS*, 672 F. App'x 776, 777 (9th Cir. 2017) (holding that Gardners' church was their alter ego for tax levy purposes); *United States v. Gardner*, 457 F. App'x 611, 612 (9th Cir. 2011) (affirming injunction barring the Gardners from "promoting, organizing, and selling their corporation sole tax scheme").

[2] The district court applied the factors articulated in *Towe Antique Ford Foundation v. IRS*, 791 F. Supp. 1450, 1453 (D. Mon. 1992) to determine if the Society is the Gardners' nominee. Neither party disputes the use of the *Towe* factors to determine nominee status.

taxes. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 349–50 (1977). The authority conferred by these statutory provisions is "broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. Nat'l Bank of Com.*, 472 U.S. 713, 719–20 (1985). This power extends to "all property of a taxpayer, including property that is held by a third party as the taxpayer's nominee or alter ego." *Fourth Inv. LP*, 720 F.3d at 1066 (citing *G.M. Leasing Corp.*, 429 U.S. at 350–51).

Although the *Towe* factors are a helpful guide in assessing the Society's nominee status, our ultimate focus is on the "totality of the circumstances," with the "overarching consideration" being "whether the taxpayer exercised active or substantial control over the property." *Id.* at 1070 (cleaned up). Reviewing de novo, we find no genuine disputes of material fact concerning the district court's determination that the Society was the Gardners' nominee.

As the district court concluded, undisputed record evidence establishes that the Gardners exercised "active or substantial control" over the Apache Knolls property despite the Society holding legal title to it. *Id.* The property's deed chain shows that Elizabeth Gardner repeatedly transferred the property to and from herself as corporation sole of various entities, including the Society, for no consideration. Mrs. Gardner also transferred the property to and from herself and

her husband in their individual capacities without consideration.[3]

The record also reflects that the Gardners continued to enjoy the benefits of the Apache Knolls property through each change in legal ownership. They have lived on the property for over twenty years. The Society pays for the Gardners' utilities and living expenses, such as their gas and telephone bills, cable and internet services, and their residential homeowner's insurance policy—despite the Gardners registering many of these accounts in their name. These undisputed facts establish the existence of a nominee relationship, *i.e.*, the Society held bare legal title to the Apache Knolls property to benefit the Gardners.

The Society does not point to any record evidence contradicting the district court's conclusion. Instead, the Society argues that a corporation sole is allowed to own and manage real property. But this appeal does not concern the legality of a corporation sole. The corporation sole form can be abused just like any other

---

[3] The dissent suggests that these transfers primarily reflect the name changes of the Gardners' church, but that is belied by the record. The Apache Knolls property has been owned and transferred between the Gardners in their individual capacity, the Gardners' church, Messiah's Remnant, and the Society, which is a different legal entity altogether. Only one of the five property transfers on the deed chain could be attributable to a church name change. The dissent also contends that transfer to the Gardners individually to qualify for a personal loan raises a triable dispute. It does not. Nominee analysis is concerned with whether the taxpayer had active or substantial control over property held by a third party, not *why* they exercised such control. *See Fourth Inv. LP*, 720 F.3d at 1070. Multiple transfers of the Apache Knolls property to different entities controlled by the Gardners for no consideration establishes the uncontradicted fact that the Gardners exercised active and substantial control over the property.

relationship or entity. Where the undisputed evidence shows that the Gardners exercised active or substantial control over the Apache Knolls property to benefit themselves despite the Society holding legal title to it, the IRS was allowed to reach the property to recover taxes owed by the Gardners.

The same conclusion holds with respect to the Society's bank account. Undisputed testimony by the Society's leadership establishes that the Gardners had decision-making authority over the Society's finances and exercised substantial control over the Society's bank account. Frederic Gardner was the co-signer on the bank account. The Society paid for the Gardners' various living expenses and utilities from this account. The Society even paid for a portion of the Gardners' legal fees from this account.

Our dissenting colleague contends that nominee status must be evaluated on an asset-by-asset basis, and the district court's failure to conduct such an analysis with respect to the Society's bank account requires reversal.[4] But the Society never raised this argument either in briefing before the district court or on appeal here. Even if it were the applicable standard, the district court did analyze the

---

[4] The dissent cites *Oxford Capital Corp. v. United States*, 211 F.3d 280 (5th Cir. 2000) for this proposition, but that decision required only that a court conducting a nominee analysis determine if the "taxpayer in fact has beneficial ownership" over the property in which legal title is held by a third party. *See id.* at 284. *Oxford Capital* is consistent with our "totality of the circumstances" test requiring a showing that the "taxpayer exercised active or substantial control over the property." *See Fourth Inv. LP*, 720 F.3d at 1070.

Society's bank account in its discussion of the *Towe* factors. The district court found that the Society pays for the Gardners' "bills and expenses" as well as their "legal fees" from the Society's checking account, and it concluded, under a totality of the circumstances, that the Gardners exercised "active or substantial control" over the Society's bank account and used the Society's funds to benefit themselves. The Society points to no evidence in the record contradicting the district court's conclusion.[5]

The Society and the dissent contend that a triable dispute exists with respect to a $50,000 donation made by a now-deceased Society member. The Society claims this donation was made to the Society to help a member in need. The record does not bear this out. Mrs. Gardner testified that the donor's instructions were for the money "to be used for the ministry for special need(s) – *for you if need be* – helping someone else." The donor's successor similarly stated that the donation was "for a special hardship [Mrs. Gardner] chose and if hard times came upon themselves use it for that necessity also." This instruction does not give rise to a disputed issue of material fact.

Finally, the dissent contends that the Government exhibits disrespect for

_____

[5] The dissent makes much of the distinction between the Society's checking account and money market account, both with Wells Fargo. The distinction is of no moment because the undisputed evidence establishes that the funds in the Wells Fargo money market account were transferred from the Society's checking account.

minority religions and does not view the Society as a bona fide religion. Nothing in the record or briefing supports this bald assertion. This is not a case about religion or how a church operates. It is about the determination of who owns and actively controls certain assets held for the benefit of another—the very purpose of nominee analysis and an inquiry that can be made without implicating protected First Amendment interests. *See Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) ("Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded.").

This appeal involves a straightforward determination of whether the Society held bare legal title to property for the benefit of the Gardners. The Society has produced no evidence establishing a genuine dispute of material fact that the Society is the Gardners' nominee as to the Apache Knolls property and the Society's bank account. Accordingly, summary judgment was properly granted in the Government's favor.

**AFFIRMED.**

*The Society of Apostolic Church Ministries Bishop, Elizabeth Gardner Corporation Sole and Her Successors v. United States of America*, No. 24-1765

BUMATAY, Circuit Judge, dissenting:

Summary judgment is appropriate only when there is no genuine dispute of material fact. That's because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here, the Society of Apostolic Church Ministries Bishop ("Society") has introduced evidence that creates a triable question on whether it's Elizabeth and Fredric Gardners' nominee. On these facts, that question should be answered by a jury—not by judges.

The Society sued the United States after the IRS recorded a tax lien against its property in Arizona ("Apache Knolls") and levied its bank account for taxes owed by the Gardners. Elizabeth Gardner is the Society's bishop and its sole corporate officeholder. Fredric, her husband, is one of its elders. Apache Knolls is the Gardners' primary residence and the meeting place of Messiah's Remnant—a church fellowship—and the headquarters of the Society. The Society's religious activity also occurs at Apache Knolls, according to the Society.

Both the Society and Messiah's Remnant are organized as corporations sole. The IRS defines a "corporation sole" as "a corporate form authorized under certain

1

state laws to enable bona fide religious leaders to hold property and conduct business for the benefit of the religious entity." Rev. Rul. 2004-27, 2004-1 C.B. 625, 626, 2004 WL 389673, at *1. Elizabeth Gardner most recently became a corporation sole of the Society under the laws of Montana. Under Montana law, the corporation sole has the power "to purchase, take, receive, lease, take by gift, devise, or bequest or otherwise acquire, own, hold, improve, use, and otherwise deal in and with real or personal property or any interest in real or personal property, wherever situated, provided that all property must be in trust for the use, purpose, and benefit of the religious denomination, society, or church for which and in whose behalf the corporation sole is organized." Mont. Code § 35-3-205(4).

The Gardners owe the IRS taxes. To collect on those back taxes, the IRS set its eye on Apache Knolls and the Society's bank account. The government's theory is that those assets in fact belong not to the Society but to the Gardners personally. Legally speaking, the government argues that the Society is the Gardners' *nominee* for both Apache Knolls and the bank account. While Arizona hasn't expressly adopted a nominee theory of liability, in general, a nominee is a person or entity that holds "bare title" to an asset for the actual benefit of someone else—the true owner. *See Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013) (analyzing California law). But if the Gardners legitimately hold those assets for the benefit of the Society and its religious activity, no nominee status has been established. In

2

determining whether an entity is a taxpayer's nominee, we look to the totality of the circumstances. *Fourth Inv. LP*, 720 F.3d at 1070.

With this standard in mind, let's turn to the facts of this case.

1. First, turning to the Apache Knolls property. Bethel Aram Ministries, the corporate entity now known as Messiah's Remnant, acquired Apache Knolls in 2003. Since then, the deed chain shows that Apache Knolls changed hands several times over the years, mostly to other successor church entities but once to the Gardners personally before being transferred back again. Here is the deed chain:

| Grantor | Grantee | Date recorded |
|---|---|---|
| Dennis M Repan and Olga Repan | Elizabeth A Gardner, A Corporation Sole of Bethel Aram Ministries | April 8, 2003 |
| Elizabeth A Gardner, A Corporation Sole of Bethel Aram Ministries | Pastor, Elizabeth A Gardner A Corporation | September 12, 2012 |
| Pastor, Elizabeth A Gardner A Corporation Sole of Messiah House Fellowship | Fredric A & Elizabeth A Gardner | December 17, 2012 |
| Fredric A & Elizabeth A Gardner | Church Restoration Ministries, Elizabeth A Gardner, A Corporation | March 7, 2013 |
| Church Restoration Ministries, Elizabeth A Gardner, A Corporation | Society of Apostolic Church Ministries, Bishop Elizabeth A Gardner, Corporation Sole | June 27, 2019 |

This deed history presents a triable issue of fact on whether Apache Knolls is held for the benefit of the Society or the Gardners personally. In favor of the

3

government are four undisputed facts. First, Elizabeth transferred the property to and from various corporation-sole entities she governs, including the Society, without consideration. Second, she transferred the property to herself and her husband one time. Third, they have enjoyed the benefits of the property by living on it for 20 years. And fourth, the Society pays for living expenses and various costs associated with homeownership, such as insurance and utilities.

While these facts might support a government verdict, a jury could reasonably draw inferences favoring the Society too. On the property transfers between different church entities, a jury could credit that some of the transfers were prompted by Messiah Remnant's name changes over the years—as Fredric said in his deposition. A religious entity should be able to change its name without fear that the new name could lead to its property being levied by the government. The majority concludes that the transfers do not primarily reflect name changes. But no facts point to this. As the deed chain shows, many of the transfers show only a name change: from *Bethel Aram Ministries* to *Messiah House Fellowship* to—after the transfer to the Gardners personally—*Church Restoration Ministries*. All three of these names refer to the same house church, which is now known, indeed, as Messiah's Remnant. Inference-drawing from these facts should be for a jury, rather than circuit judges.

4

On the transfer to the Gardners personally, a jury could find, again as explained by Fredric, that they transferred the property to their name at the direction of a bank to qualify the Society for a loan to fund a roof repair. In claiming it's irrelevant that the Apache Knolls property was transferred to the Gardners for the benefit of the Society, the majority makes a broad ruling that would make every corporation sole (and all religious organizations using the corporation sole structure) a nominee under its view of the law. To the majority, it doesn't matter *why* a property is transferred and "[m]ultiple transfers of the Apache Knolls property to different entities controlled by the Gardners for no consideration" is enough to establish nominee status. The majority cites no Arizona law for this exceedingly broad proposition of law. It also fails to acknowledge that Montana law expressly permits a corporation sole to transfer real property between church entities without consideration. *See* Mont. Code § 35-3-205(4). Most importantly, it misunderstands what the nominee inquiry is about—it's trying to determine who truly benefits from the asset. Of course the reason why a property is transferred is crucial to that inquiry. Under the majority's novel theory of law, every corporation sole now is in danger of being deemed a nominee of its officer.

The majority also holds it was sufficient that the "Society held bare legal title to the Apache Knolls property to benefit the Gardners." Again, this asks the wrong question. The right question is: Did the Apache Knolls property *also* benefit the

5

Society? If so, then it's not dispositive that the property also happened to benefit the Gardners. For example, if the Apache Knolls property was used for weekly religious services (as the Society contends), then it serves the Society even if the Gardners also personally benefitted. At least there's a triable issue of fact on that question and so summary judgment was inappropriate.

A jury too could find that the Gardners' living at the property and the Society's paying associated expenses is not evidence of a nominee relationship but is instead simply indicative of their roles in the church. The Gardners, after all, claim that they took vows of poverty and that they conduct church business from the property, which they call a parsonage. All sorts of religions provide dwelling places for their leaders and pay their expenses, including personal expenses. Would we be here today if the parsonage-dwelling, vow-of-poverty-taking bishop led a better-known church?

Permeating the government's theory of liability is the government's dislike of the way the Society runs its internal finances and how much control it cedes to Elizabeth Gardner. But this argument treads on dubious constitutional territory. The government has no role in dictating the proper form of church governance. *See, e.g., Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753 (2020).

Because there are triable issues of fact about whether Apache Knolls benefited the Society—rather than only the Gardners personally—this claim should have gone to the jury.

2. The bank account presents a triable question too. And here the case for remand should be even more uncontroversial: that's because the district court did not conduct nominee analysis *at all*. That's enough to send it back. The district court simply concluded that because the Society was the Gardners' nominee for Apache Knolls, then it must also be for the bank account. But that's wrong as a matter of logic and law.

Even if the Gardners were found to be the nominee of some of the Society's assets, that doesn't mean they are the nominee for all its assets. The Gardners could hold some of the Society's assets solely for their benefit but legitimately hold some assets for the benefit of the Society. That's why the nominee analysis proceeds asset-by-asset. The idea is to establish who the true owner of the asset is. If the government wanted to avoid this searching asset-by-asset inquiry, it could have charged the Society with being the Gardners' *alter ego*. *See Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000) (explaining the difference between a nominee and an alter ego). That's a stronger claim, one that would essentially require the government to prove that the Society's corporate status is itself is a sham or fraud. If it succeeded, the IRS could reverse pierce the Society's corporate veil and get at its assets. *See id.* But the IRS does not argue that the Society is the Gardners' alter ego—only their nominee.

The majority suggests that this argument was forfeited. Reading the Society's complaint shows that this is wrong. The complaint makes clear that the Society's action was for both "quiet title" and "wrongful levy"—two separate actions. It shouldn't fall on the Society to ensure that the district court properly followed the law.

In any event, the majority concludes that the district court analyzed the bank account by mentioning in passing the Society's checking account in its discussion of a few *Towe* factors. That analysis ignores that most of the levied funds, including a sizeable donation, came not from the Society's checking account but from its money market account, which the district court did not analyze. To the extent it analyzed the Society's bank account at all, the district court collapsed the checking account and Apache Knolls into the same analysis and concluded that the Society is the Gardners' the nominee as a matter of law. The problem with this analysis is that it failed to proceed asset-by-asset. When district courts conduct the wrong analysis, we ask them to try again. Why not here?

What's more, the government surprisingly admitted at oral argument that it didn't know how the Society spent the money in the account. So the government doesn't even know if the Society used the account for bona fide religious purposes— or for the Gardners' personal expenses—yet it wants to immediately claim

ownership. That the government and the district court failed to do this analysis is troubling.

The record shows that a $50,000 donation was made by a late donor to "be used for the ministry for any special need(s) and for you if need be—helping someone else." The majority waves away too quickly the significance of this donation: a jury might reasonably infer from its deposit in the levied account that the account truly belongs to the Society, not to the Gardners. This is true even though Elizabeth Gardner had complete control over the donated funds—it is not uncommon that an organization's top leader is the ultimate authority on how donations are spent.

The government may be right, but the Society deserves a jury trial—not judges sitting as their overseers.

\* \* \*

When called to weigh evidence and draw inferences from that evidence, judges must tread lightly, avoiding trespassing on the domain reserved for juries. *See Anderson*, 477 U.S. at 255 (1986). Here, because "conflicting inferences may be drawn from the facts"—on both Apache Knolls and the bank account—"the case must go to the jury." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). Summary judgment was thus inappropriate. We should have reversed and remanded.

9

I respectfully dissent.